# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MCALLISTER EQUIPMENT CO., et al,**
   **Plaintiffs,**

 v.                Case No. 09-C-0915

**GREGORY D. QUIRK, et al.,**
   **Defendants.**

---

## DECISION AND ORDER

On September 21, 2009, plaintiffs McAllister Equipment Co. ("McAllister") and American Midwest Equipment Corp. ("American Corp.") filed this action against Gregory D. Quirk, Ten Bears Equipment Company, Inc. ("Ten Bears"), and American Midwest Co. ("American Co."), alleging various claims arising out of an asset purchase agreement and subsequent events. I have jurisdiction because the parties are diverse and the amount in controversy exceeds $75,000. Before me now is plaintiffs' motion for preliminary injunction, in which plaintiffs seek to enforce a covenant not to compete against Quirk.

## I. BACKGROUND

Between 1990 and December 2005, Quirk owned and operated American Midwest Equipment Co. ("American Co."), a company that sold, brokered and rented heavy construction equipment, with a focus on used equipment, from a location in Ixonia, Wisconsin. In 2005, Quirk began talking to Jack Moser, the president and CEO of McAllister Equipment Corp. ("McAllister"), about McAllister potentially acquiring American Co. McAllister, which operated primarily in the Chicago area, was also in the heavy construction equipment business, although at the time Quirk and Moser met, McAllister

focused mainly on new equipment. McAllister was interested in acquiring American Co. as a way to grow its used equipment business.

On December 20, 2005, the parties entered into an asset purchase agreement in which McAllister's newly formed subsidiary, American Equipment Corp. ("American Corp."), purchased the assets of American Co.[1] The assets consisted primarily of fifty-four pieces of used construction equipment. The asset purchase agreement provided that, in addition to paying cash for these assets, American Corp. would employ Quirk for a period of eighteen months following the closing. The agreement referred to this eighteen-month period as the "Sale Period." (Agreement § 4.3.) The agreement contained various provisions governing Quirk's employment and contained financial incentives designed to encourage Quirk to sell the acquired pieces of equipment during the Sale Period. One of the financial incentives was payment of a $250,000 "holdback." (Agreement § 4.3.) This holdback was a portion of the purchase price that McAllister would hold back until Quirk sold a certain percentage of the purchased assets.

Another financial incentive involved Quirk's compensation structure. The agreement provided that for the first twelve months of Quirk's employment, Quirk would be paid only $20,000 in salary. After the first twelve months, Quirk's salary would increase to $20,000 per month – i.e., $240,000 per year. (Agreement § 5.2.) During the initial twelve-month period, however, Quirk would be eligible to earn performance-based bonuses up to $220,000. These bonuses were tied to the holdback provisions, meaning that if Quirk met

---

[1] According to McAllister, American Corp. was merely a "shell company" used to hold the assets purchased from American Co. and Quirk. For all intents and purposes, American Corp. was simply the used equipment division of McAllister. (Moser Aff. [Docket #39-1] ¶ 5.)

2

the sales incentives specified in the holdback provisions, he would also receive a certain percentage of the bonus amount. (Agreement § 5.3.)

The asset purchase agreement included provisions governing the termination of Quirk's employment, as well as noncompete provisions. The termination provisions stated that American Corp. could terminate Quirk at any time without cause on thirty-days' notice, and that it could "immediately terminate Quirk's employment for Cause at any time during the Sale Period." (Agreement § 5.4.) The agreement defined "Cause" as

> (i) any misconduct by Quirk, defined as Quirk's substantial and willful disregard of Buyer's[2] policies and practices, which is materially injurious to Buyer or its reputation, monetarily or otherwise; (ii) Quirk engaging in any act involving dishonesty, breach of trust or a violation of the laws of any state or the United States; or (iii) Quirk's failure to meet performance goals or failure to perform his duties for Buyer in an acceptable manner as reasonably determined by Buyer (other than such failure resulting from his incapacity due to physical illness).

(Agreement § 5.4.) The noncompete provisions stated as follows:

> For a period of two (2) years after the termination of Quirk's employment by Buyer, whether as a result of his termination with Cause, the expiration of the Sale Period or otherwise, or the resignation or termination by Quirk, Quirk agrees that he will not, directly or indirectly, as an employee, corporation, consultant, partner, shareholder, member, officer, director or in any other capacity, solicit or engage in the nature and type of services that he performed while employed by Buyer for any of the following: (i) any individual or entity which is a customer of Buyer at the time of Quirk's termination; (ii) any individual or entity which was a customer of Buyer at any time within the three (3) years immediately preceding Quirk's termination; (iii) any individual or entity which was a customer of Seller[3] at any time within the three (3) years immediately preceding the Closing; or (iv) any prospective customer with whom Quirk had actual contact during the Sale Period. This restriction shall not apply if Quirk is terminated by Buyer without Cause.

---

[2]The agreement defined "Buyer" as American Corp. (Agreement, introductory clause.)

[3]The agreement defined "Seller" as American Co. (Agreement, introductory clause.)

(Agreement § 5.6.)

Quirk worked for American Corp. from the time of the closing, December 20, 2005, until his termination on September 18, 2008. For most of that time, Quirk was in charge of American Corp. and was its principal salesman. However, by June 2007, when the eighteen-month Sale Period ended, Quirk had not sold enough equipment to qualify for any part of the holdback or any bonus. By that time, Quirk was earning a base salary of $240,000 per year. Quirk's sales did not improve after the end of the Sale Period, and in late August of 2008, Jack Moser of McAllister decided to talk to Quirk about his performance. Moser's principal concern was Quirk's failure to sell a substantial percentage of the equipment acquired under the asset purchase agreement. However, Moser also expressed concern about Quirk's management of American Corp. In particular, Moser was concerned about Quirk's failure to adhere to a cap on the amount of inventory that American Corp. could carry at any one time and Quirk's failure to follow company policy on a number of different matters.

On September 3, 2008, Moser sent Quirk an email informing him that McAllister was making changes to Quirk's compensation structure and level of responsibility. Moser told Quirk that he was a better salesman than manager, and that McAllister wanted to change the terms of Quirk's employment in an effort to refocus Quirk's attention on sales. As part of this effort, Moser proposed to lower Quirk's salary but raise the commissions he earned on sales. Moser also informed Quirk that he would be reporting to a new vice president of used equipment, and that this vice president would make all final decisions with respect to the management and administration of American Corp. Because McAllister could not alter Quirk's compensation without amending the compensation provisions in the asset

4

purchase agreement, Moser informed Quirk that he would be sending Quirk a proposed amendment to the asset purchase agreement. On September 6, 2008, Quirk responded to Moser's email and stated that although he would accept the changes to his managerial and administrative duties, he would not accept the changes to his compensation structure.

On September 17, 2008, Moser sent Quirk a letter informing him that McAllister had terminated his employment. Moser stated that the termination was for cause and that therefore it triggered the noncompete provisions of the asset purchase agreement. Moser then listed more than eleven reasons for Quirk's termination, including his failure to meet sales goals and failure to follow a wide variety of McAllister's policies and practices.

On September 26, 2008, Quirk's attorney informed McAllister that Quirk's position was that he was terminated without cause and that therefore he was not bound by the noncompete provisions of the asset purchase agreement. Quirk then returned to selling and brokering the sale of used construction equipment and currently does so through an entity known as Ten Bears Equipment Co., Inc. ("Ten Bears"). Quirk operates this business out of Oconomowoc, Wisconsin.

McAllister contends that Quirk is soliciting its customers in violation of the covenant not to compete. It brought this motion for a preliminary injunction to enforce the covenant, and I held an evidentiary hearing on the motion. I discuss my findings of fact and conclusions of law below.

## II. DISCUSSION

When confronted with a motion for a preliminary injunction, a district court proceeds in two distinct phases: a threshold phase and, if necessary, a balancing phase. <u>Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.</u>, 549 F.3d 1079,

1085-86 (7th Cir. 2008). To survive the threshold phase, a party seeking a preliminary injunction must establish three elements: First, that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims. Second, that traditional legal remedies would be inadequate. And third, that its claim has some likelihood of succeeding on the merits. Id. at 1086. If the court determines that the movant fails to establish any of these elements, it must deny the injunction. Id. If, however, the court finds that the movant passes the initial threshold, it then proceeds to the balancing phase of the analysis. Id.

In the balancing phase, the court weighs the irreparable harm that the movant would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court granted the requested relief. Id. In doing so, the court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." Id. (internal quotation marks omitted). Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the "public interest"). Id. The court's goal in conducting the balancing phase of the analysis is to minimize the cost of potential error: "the error of denying an injunction to one who will in fact (though no one can know this for sure) go on to win the case on the merits, and the error of granting an injunction to one who will go on to lose." Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 388 (7th Cir. 1984). The court must "try to avoid the error that is more costly in the circumstances." Id.

For purposes of the present motion, the key issues are whether plaintiffs are likely to succeed on their claim that McAllister terminated Quirk for cause, and if so, whether this likelihood of success, when weighed against the parties' respective irreparable harms, justifies the issuance of a preliminary injunction. I find that plaintiffs have satisfied the threshold requirements for preliminary relief, and therefore I will focus my discussion on the balancing phase.

**A.  Likelihood of Success on the Merits**

As noted, plaintiffs' likelihood of success turns on whether they are likely to prove at trial that McAllister terminated Quirk for cause. Although defendants raise other legal issues bearing on plaintiffs' likelihood of success (namely, whether McAllister had the right to terminate Quirk for cause outside of the Sale Period and whether the noncompete provisions are enforceable under Wisconsin law), I find that the issue of cause is dispositive and therefore do not discuss the remaining issues.

When McAllister terminated Quirk, Jack Moser sent Quirk a letter outlining the following reasons for his termination:

1. Failure to meet performance goals for the fiscal years ending September 2006, 2007 and the period ending August 31, 2008;
2. Failure to meet performance goals in that less than 26% of the purchased inventory was sold during the Sale Period;
3. Renting equipment to customers or allowing equipment to be removed from Company premises by third-parties without a signed rental or lease agreement.
4. Failure to communicate with me and upper levels of management regarding the operation of the business and matters affecting the business;
5. Making expenditures for capital assets without approval;
6. Making expenditures for repairs on capital assets without approval;
7. Failure to inform the President of the Company that the real estate the Company rented from you was sold to third parties;
8. Failure to follow Company procedures and policies, including:

7

  a. Failing to submit a Paid Time Off (PTO) Request or obtaining approval for your time off/vacation;
  b. Consenting to the discharge of a subordinate employee without hiring committee approval;
  c. Offering employment without hiring committee approval;
  d. Allowing an employee to take time off without pay during the employee's introductory period and allowing additional time off for which the employee was not eligible;
9. Failure to limit the amount of Inventory to the Inventory cap which was set in January, 2006 at $12.5 Million unless approved by President. Since June 2006, the inventory has never been below $13 million and has been as high as $16.6 million. Only once was such approval requested and granted;
10. Failure to insure goods shipped overseas, and;
11. Underestimating the cost of repairs needed on trade-in equipment.

(Moser Aff. [Docket #5] Ex. A.) Plaintiffs argue that the reasons Moser listed in this letter constituted cause for Quirk's termination.

  Plaintiffs' reasons can be divided into those relating to Quirk's sales performance and those relating to his failure to follow various policies and procedures. Regarding Quirk's sales performance, the asset purchase agreement provided that McAllister would have cause to terminate Quirk if he "fail[ed] to meet performance goals or fail[ed] to perform his duties for [McAllister] in an acceptable manner as reasonably determined by [McAllister]." (Agreement § 5.4(iii).) Defendants argue that Quirk failed to meet the performance goals McAllister had set for him. According to Quirk, however, McAllister never gave him any performance goals. Defendants insist that the holdback and bonus provisions of the asset purchase agreement constituted performance goals, and that in addition to these goals McAllister set goals for Quirk in the form of the company's yearly "budget process." (Tr. at 133.) Plaintiffs argue that the holdback and bonus provisions were not themselves "performance goals" within the meaning of the asset purchase

8

agreement, and that McAllister never told Quirk that his "budget" contained any performance goals.

I find that plaintiffs are unlikely to prove at trial that the holdback and bonus provisions of the asset purchase agreement constituted "performance goals" within the meaning of Section 5.4(iii). The asset purchase agreement explains the circumstances under which Quirk would be entitled to the holdback and bonus payments, and nothing in the agreement indicates that Quirk's failure to qualify for those payments would give rise to cause for termination. Instead, the agreement makes clear that if Quirk failed to sell enough equipment to qualify for either the holdback or the bonus, the penalty would be forfeiture of the holdback and bonus payments. (Agreement § 4.3.)

Further, I find that although plaintiffs have some likelihood of showing that the "budget process" involved setting performance goals for Quirk and that Quirk failed to meet them, plaintiffs' likelihood of success on this matter is low. McAllister did not explicitly inform Quirk that the budget process included performance goals, or that failure to meet the budgeted sales projections would constitute cause for termination. (Tr. at 112-13.) Rather, McAllister simply assumed that Quirk understood that the budget process included performance goals. (Tr. at 133, 177-78.) Indeed, until McAllister terminated Quirk in September 2008, no one at McAllister informed Quirk that he had failed to meet any performance goals, even though, according to the termination letter, Quirk had failed to meet each and every performance goal that McAllister had ever set for him. If McAllister really had set performance goals for Quirk and Quirk failed to meet them as often as plaintiffs claim, then McAllister likely would have informed Quirk of these facts sooner. For

9

this reason, I find that plaintiffs have a low likelihood of success on their claim that Quirk was terminated for failing to meet performance goals.

Regarding Quirk's failure to follow McAllister's various policies and procedures, the testimony at the hearing leads me to conclude that many of the infractions on Moser's list were relatively minor, such as Quirk's making personnel decisions without hiring committee approval and failing to inform the company that Quirk had sold a relatively unimportant piece of real estate that the company leased from him. I will not discuss these matters in detail other than to note that plaintiffs are unlikely to prove that these infractions constituted a "substantial and willful disregard of [McAllister's] policies and practices, which is materially injurious to [McAllister] or its reputation, monetarily or otherwise." (Agreement § 5.4(i).)

The only potentially serious infraction I can identify is Quirk's failure to adhere to an "inventory cap" – that is, a cap on the book value of all equipment that Quirk purchased for resale or leasing. McAllister informed Quirk that he could not, without company approval, purchase additional assets if the purchase would raise the book value of American Corp.'s inventory above $12.5 million. McAllister imposed this cap in an effort to reduce the interest payments and other costs associated with having a substantial amount of unsold equipment on hand. However, Quirk did not adhere to this cap and at times added equipment to his inventory even after McAllister had warned him that he was already above the cap. (Tr. at 90-94.) McAllister's controller estimates that Quirk's failure to adhere to the inventory cap cost the company close to $330,000 in interest payments. (Tr. at 24.)

In response to plaintiffs' contention that Quirk's failure to adhere to the inventory cap constituted cause for his termination, Quirk states that anytime his inventory exceeded the

10

cap, it was because Quirk had added "presold" equipment to the inventory – that is, equipment already committed to a buyer or renter. (Tr. at 128.) When he added this equipment to inventory, it would stay on McAllister's books until the sale or rental transaction was completed and the buyer or renter took possession of the equipment. McAllister agrees that any presold equipment added to inventory did not count against the cap. (Tr. at 24.) However, it contends that presold inventory could not possibly account for the fact that Quirk was consistently over the inventory cap, sometimes by as much as $4 million. (Tr. at 146-48.)

I find that plaintiffs have some likelihood of proving that Quirk's failure to adhere to the inventory cap constituted cause for his termination. Quirk admits that he knowingly exceeded the cap, and his contention that every time he exceeded the cap it was because of presold equipment is unpersuasive given the amount by which he exceeded the cap. Further, Quirk's failure to adhere to the cap may have been "materially injurious" to McAllister (Agreement § 5.4(i)), in that it cost McAllister as much as $330,000 in unwanted interest payments.

On the other hand, although McAllister occasionally reminded Quirk of the cap and informed him that he had exceeded it, McAllister did not reprimand Quirk for exceeding the cap until it terminated him in September 2008. (Tr. at 202-03.) The lack of any reprimand prior to Quirk's termination is significant because plaintiffs claim that Quirk began to exceed the cap almost as soon as he joined the company in 2006. One would think that if Quirk's failure to adhere to the cap were truly "materially injurious" to McAllister's interests, then McAllister would have been more aggressive in its efforts to discipline Quirk for his persistent disregard of the cap. So although plaintiffs have some likelihood of showing that

11

Quirk's failure to adhere to the inventory cap was cause for his termination, I find that the likelihood of success on this issue is low.

**B.    Irreparable Harm and the Sliding Scale**

I next consider whether plaintiffs have no adequate remedy at law and whether they will suffer irreparable harm if Quirk is not preliminarily enjoined from competing with McAllister. I also consider whether Quirk will suffer irreparable harm if he is so enjoined and weigh the parties' respective irreparable harms as part of the sliding scale analysis.

McAllister concedes that it has a remedy at law for Quirk's alleged breach of the noncompete provisions – specifically, damages representing the amount of monetary harm caused by Quirk's competition. However, McAllister argues that a damages remedy is inadequate because damages would be hard to calculate. See Roland Mach. Co., 749 F.2d at 386 (difficulty in calculating damages may make damages remedy inadequate). McAllister does not dispute that damages representing the actual sales that Quirk made to customers covered by the noncompete provisions would be easy to calculate, inasmuch as these sales would be well-documented by purchase orders and McAllister could easily calculate the profits it would have made had it rather than Quirk made the sales. What McAllister is concerned about is Quirk's interference with McAllister's customer relationships. McAllister points out that customers buy heavy construction equipment only infrequently, and that for this reason a dealer must cultivate its customer relationships over a long period of time. If the dealer is not able to service the customer at the time the customer happens to be in the marketplace, then the dealer misses an opportunity to further the customer relationship and lay the groundwork for selling to the customer in the future. (Tr. at .154-56.) McAllister thus argues that Quirk's sales to its customers results

12

in harm above and beyond the lost profits on those specific sales, and that this harm is difficult to quantify.

Based on the testimony adduced at the preliminary injunction hearing, I conclude that although McAllister may find it difficult to monetize the harm caused by Quirk's competition, McAllister's harm is not particularly substantial in the first place. Although Quirk has been soliciting McAllister customers in violation of the noncompete provisions since September 2008, the evidence reveals that Quirk has made only $27,700 in profits from sales to prohibited customers – an amount which McAllister describes as "minuscule."[4] (Tr. at 212, 214.) McAllister would have the court believe that although the profits from these sales have been minuscule, Quirk's tampering with McAllister's customer relationships is so pervasive that it has the potential to put McAllister out of business. (Tr. at 160.) I find this contention incredible. Indeed, McAllister has identified only one customer that Quirk has solicited in violation of the noncompete provisions (Payne & Dolan Inc.), and this is a customer that McAllister has not even contacted since the date of Quirk's termination, aside from occasional mass emails that McAllister sends to all of its prospective customers. (Tr. at 165-67; Bechthold Aff. [Docket #45] ¶¶ 4, 8.) On this record, then, it appears that Quirk's competition over the last nineteen months has been little more than an insignificant nuisance to McAllister.

Further, the noncompete provisions of the asset purchase agreement expire by their terms in September 2010. This means that even if I granted a preliminary injunction it

---

[4]To be sure, plaintiffs suspect that Quirk has made more than $27,700 in profits through sales to McAllister's customers, but they have offered little evidence to substantiate their suspicions.

13

would expire in only a few months. Given the minuscule amount of harm that Quirk has caused McAllister over the last nineteen months, it is exceedingly unlikely that Quirk will cause significant harm over the next five months. Thus, even though McAllister may find it difficult to calculate the harm caused by Quirk's interference with McAllister's customer relationships, that harm is so slight in the first place that it does not weigh very heavily on McAllister's side of the scale.

Turning to the irreparable harm that Quirk might suffer if he were enjoined from soliciting customers in violation of the noncompete provisions, I find that he would suffer some irreparable harm, but not much. The noncompete provisions do not prohibit Quirk from competing in the used construction equipment business altogether; rather, Quirk would be prohibited from soliciting a small subset of customers – mainly current and former customers of McAllister and some prospective customers. As discussed, sales to customers falling within the noncompete provisions do not seem to constitute a substantial part of Quirk's business. And because a preliminary injunction would last for only a few months, it is unlikely that it would cause Quirk to lose a large number of sales. To the extent that the preliminary injunction causes Quirk to lose sales and it turns out that a preliminary injunction should not have been issued, Quirk could recover damages from McAllister representing the profits that Quirk would have made had he not been enjoined. See Fed. R. Civ. P. 65(c); Roland Mach. Co., 749 F.2d at 387. Nonetheless, Quirk is likely to suffer some irreparable harm in that it will be difficult to prove that he would have made certain sales had he not been subject to the preliminary injunction. Further, Quirk's business is much smaller than McAllister's, and thus he is likely to feel the impact of missed sales more severely than would McAllister. Although it is incredible to think that

14

Quirk's interference with McAllister's customer relationships could threaten McAllister's financial health, it is at least somewhat likely that a preliminary injunction would pose a risk to Quirk's financial health. Thus, I conclude that the irreparable harm that Quirk would suffer if a preliminary injunction were granted outweighs the irreparable harm that McAllister would suffer if a preliminary injunction were not granted.

In light of the foregoing analysis, it is clear that the sliding scale tips in Quirk's favor. Plaintiffs have some likelihood of success on the merits, but that likelihood is low. Further, the balance of irreparable harms is in Quirk's favor. Accordingly, plaintiffs' motion for a preliminary injunction will be denied.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that plaintiff's motion for a preliminary injunction is **DENIED**.

Dated at Milwaukee, Wisconsin, this 12 day of May, 2010.

/s_____
LYNN ADELMAN
District Judge

15

Case 2:09-cv-00915-LA   Filed 05/12/10   Page 15 of 15   Document 70